IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO iPHONES, CURRENTLY LOCATED AT 549 US ROUTE 302, TWIN MOUNTAIN, NEW HAMPSHIRE | Case No. 21-mj-160-01/02-AJ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Juan Infante, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Trooper First Class Detective with the New Hampshire State Police and I have been a fulltime certified Police Officer in the State of New Hampshire for approximately 16 years. I attended and graduated from the 139th New Hampshire Police Academy where I obtained my certification as a fulltime police officer. From 2005 until 2010, I was employed as a police officer with the Town of North Hampton, New Hampshire Police Department. I was assigned to the Patrol Division of the North Hampton Police Department. Some of my duties while assigned to the Patrol Division included basic patrol duties, investigations ranging from minor violations to misdemeanors and felonies, report writing, interviewing witnesses and

suspects, and evidence collection and processing. I have also completed search and arrest warrants that involved violations of the Controlled Drug Act.

3. In 2010 I joined the New Hampshire State Police and was assigned to the Troop B barracks in Bedford, NH as a patrol trooper. In 2015, I was assigned to the New Hampshire State Police Narcotic Investigation Unit. While assigned to the Narcotic Investigation Unit, my primary duties are to investigate violations of the New Hampshire Controlled Drug Act, NH RSA 318:B-2. Many of the investigations that I have been involved with relate to offenses involving the possession, sale, and possession with intent to sell various controlled drugs. During the summers of 2012 and 2013, I was assigned to a street crimes unit within the City of Manchester where I worked in conjunction with Manchester police officers in a plain clothes capacity to combat prostitution, gang, drug, and street crimes throughout the city.

4. In October of 2015, I was assigned as a Task Force Officer with the United States Drug Enforcement Administration ("DEA") Strike Force-Manchester District Office. While assigned to the DEA Strike Force, my primary duties are to investigate the distribution of controlled substances in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846. I have personally been involved in various drug investigations. During these investigations, I have acted in an undercover capacity purchasing controlled drugs from street level dealers. I have also personally observed the distribution, sale, and possession, of various controlled substances including, but not limited to, cannabis, cocaine, cocaine base ("crack" cocaine), heroin, fentanyl, oxycodone, methamphetamine, and marijuana.

5. I have received significant training in the field of narcotics enforcement and investigations. I have attended the New England Regional FBI Basic Undercover School, DEA Asset Forfeiture Training, DEA Clandestine Laboratory Training, DEA Clandestine Tactical

Training, DEA Domestic Cartel Conference, Title III Wiretap Investigative Experience, and NH Search & Seizure Training. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts. Also during my training and experience as a law enforcement officer, I have participated in investigations related to drug possession, drug transportation, fatal motor vehicle collisions involving drug/alcohol impaired drivers, serious personal injury collisions involving drugs and alcohol, burglaries, thefts and unattended deaths.

6. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including the purchasing, manufacturing, storing, and distributing of narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

7. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, the New Hampshire State Police, and local police departments. Since this

affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8. The property to be searched is a black iPhone with a black Otterbox cover (no serial number visible) in an evidence bag labeled F19-15910 MRB-09, hereinafter "Device 1," and a cracked silver iPhone with a red case in an evidence bag labeled F19-15910 MRB-10, hereinafter "Device 2," collectively, "the Devices." The Devices are currently located in the New Hampshire State Police Troop F evidence room, at 549 US Route 302, Twin Mountain, New Hampshire.

9. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

10. Jason Hart has been charged by indictment with one count of possession with the intent to distribute methamphetamine and fentanyl, and one count of possession with intent to distribute fentanyl, in *United States v. Hart*, District of New Hampshire, 20-cr-72-PB. Count one relates to a traffic stop and drug seizure that occurred on October 9, 2019. Count two relates to an arrest and drug seizure that occurred on May 9, 2020.

*October 9, 2019 Traffic Stop and Drug Seizure*

11.     On October 9, 2019, New Hampshire State Trooper Jeremy Brann conducted a traffic stop of a truck after noticing that the truck had wide tires.[1]  Trooper Brann ran the license plate and learned that the truck was registered to John Wight of Goffstown, New Hampshire. Wight had an expired driver's license.  Other than a dog, the driver, later identified as Jason Hart, was the sole occupant of the truck.  Hart provided a false name and date of birth but said that he did not have a license on him.  He also claimed not to have any other form of identification.  Hart provided a street address to Trooper Brann but, despite claiming to have lived at the address for 15 years, the defendant did not know the zip code.

12.     By comparing images of the name Hart provided to troopers with Hart, troopers were able to confirm that he was providing them with a fake name.  Troopers ultimately arrested Hart for disobeying a police officer.  During a search incident to arrest, a trooper found a large sum of cash in Hart's pocket, which Hart estimated to be "thousands."  The money was later counted and determined to be more than $3,500.  After his arrest, Hart ultimately provided his true name and date of birth to law enforcement officers.  The arresting officer, Trooper Michael Bruno, learned that Hart was wanted for a parole violation.

13.     Once Trooper Bruno determined that the truck could not be released back to Hart, he contacted a towing company.  Two other New Hampshire State Troopers secured the dog left behind and began an inventory of the truck. They found drug paraphernalia during the inventory, including a glass pipe commonly used for smoking illegal drugs, a rolled-up dollar bill,

---

[1] Hart has moved to suppress the traffic stop, the decision to impound the truck, the inventory, and the warrant search of the truck.  A hearing on the suppression motion is scheduled for June 29, 2021.

suspected marijuana, and another glass pipe.  Troopers stopped the inventory while Trooper Bruno obtained a warrant to search the truck.  The warrant was executed that day.

14.     During the warrant search of the truck, troopers found a scale, a drug ledger, metal knuckles, the Devices, and what chemists later identified as 90.01 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl); 2.775 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl); 1.239 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl); 111.1 grams of d-Methamphetamine Hydrochloride (100% +/- 6% purity); and 35.1 grams of d-Methamphetamine Hydrochloride (100% +/- 6% purity). Device 1 was located on the center console of the truck. Device 2 was located on the passenger seat of the truck.

### *Attempted Extraction of the Devices*

15.     In October of 2019, Trooper Bruno obtained a warrant to search the Devices.[2] The Devices were submitted to the Grafton County Sheriff's Department's Computer Forensic Unit for a forensic evidence examination.  The examiner was unable to extract any information from the Devices.  Since their attempted extraction, the Devices have been powered off and stored in the New Hampshire State Police Troop F evidence room, at 549 US Route 302, Twin Mountain, New Hampshire.

---

[2] To date, Trooper Bruno has provided an unsigned copy of the electronics search warrant.  I understand from Trooper Bruno, however, that the warrant was signed and authorized.

*May 9, 2020 Arrest and Drug Seizure*

16. On May 9, 2020, a police officer with the Bow Police Department observed an unoccupied vehicle parked at the Circle K gas station. The officer checked the vehicle's registration and learned that the owner, Kenneth Palmer, had a full extraditable warrant issued from Georgia for a probation violation. The owner confirmed the warrant and then saw Palmer and another individual, later identified as Hart, get into the vehicle.

17. The officer arrested Palmer on the outstanding warrant. Because Hart did not have a valid driver's license, officers told Hart that he was free to go, but that they would have to tow the vehicle. Officers began an inventory of the car while waiting for the tow truck and found two glass pipes with suspected drug residue in the driver's side door pocket and, in a backpack on the back passenger's seat, a purple zipper bag containing suspected heroin. The purple zipper bag also contained a State of New Hampshire Department of Health and Human Services card with the name "Jason P Hart" on it. Officers stopped the inventory and got a warrant to search the car. Both Palmer and Hart denied ownership of the drugs and both were arrested for the possession of heroin. During the later warrant search of the car, Officers also seized a black iPhone in an Otterbox case, hereinafter "Device 3."

18. The drugs seized on May 9, 2020, were sent to the lab for analysis and a chemist identified the drugs as: (1) 26 paper wrappers, each containing a cylinder of compressed brown powder, had a total weight of 264.5 grams. The substance from 5 of the wrappers was analyzed, and found to contain fentanyl (for a total of 50.87 grams of substance that tested positive for fentanyl); and (2) 13 paper wrappers, each containing a cylinder of compressed brown powder,

had a total weight of 132.2 grams. The substance from 5 of the wrappers was analyzed and found to contain fentanyl (for a total of 50.85 grams of substance that tested positive for fentanyl).

19. On May 11, 2020, officers obtained a warrant to search Device 3. According to the extraction report from the extraction of Device 3, the Apple ID associated with Device 3 is "jayhart1973@icloud.com." 1973 is the year Hart was born. The extraction also yielded conversations that, in my training and experience, indicate that Device 3's user was distributing drugs.

20. For example, on May 9, 2020, Device 3's user had the following conversation with someone identified as Kenny P:

> Kenny P: Hey bro you back here at the house yet?
>
> Device 3's user: Yes what up
>
> Kenny P: Oh cool can you come down and sell me like a 50 or something? What's your prices?
>
> Device 3's user: I charge 50 a g

21. In another message that day, Device 3's user told someone: "I gotta get 275 a stks that's what the guy sad that I am selling them for." On May 8, 2020, Device 3's user texted: "I got powder" to someone identified as Ricks Son. When Ricks Son asks for the "ball price," Device 3's user responds "275 I would like I pay 225" and then "Ya 250 I don't care." Some of other conversations include Device 3's user saying "2for 250 the best I can do," "400 for 4 balls," and "I will give 3grams."

22. Based on my training and experience, I believe Hart was the user of Device 3. I base this on the Apple ID associated with Device 3 as well as the fact that, on May 9, 2020,

Device 3's user was communicating with someone named "Kenny P," the same first name and last initial of Kenneth Palmer, who Hart was arrested with.

### *Law Enforcement Learn the Password to the Phone Seized on October 9, 2019*

23.     Trooper Bruno obtained copies of the jail calls Hart made after his October 9, 2019 arrest.  In preparation for the upcoming trial in this matter, scheduled for July 7, 2021, those calls are being reviewed for potential trial exhibits.  In a call with his mother, he tells her that his cellphone is locked and then tells her the password to his cellphone.  During this same call, Hart is arranging for his mother to assist two friends in getting the truck released from impound.  With the password to Hart's phone, and based on my training and experience, a new forensic examination of the Devices is more likely to be successful than the initial extraction.

24.     The Devices are currently in the lawful possession of the New Hampshire State Police.  It came into the State Police's possession in the following way: The Devices were seized during the warrant search of a truck on October 9, 2019. A later warrant authorized the search of the Devices, but those extractions were unsuccessful. Therefore, while the State Police might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

25.     The Devices are currently in storage at the New Hampshire State Police Troop F evidence room, at 549 US Route 302, Twin Mountain, New Hampshire. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the

extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the New Hampshire State Police.

26.     Based upon my training and experience, I know that drug traffickers frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities and to store information such as names, addresses, phone numbers, banking records, and logs of narcotics sales. The information stored on phones may include pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, records of purchases of other drug-related implements and paraphernalia. Bank records, checks, credit card bills, and other financial records stored on cell phones can often constitute evidence of drug proceeds.

27.     Through my training and experience, I know that drug traffickers communicate using cell phones through a variety of mediums, including voice and video calling, text messaging (*i.e.*, SMS and MMS), electronic mail, and private messaging services (*e.g.*, Snapchat, iMessage, WhatsApp, Instagram, and Facebook).  Specifically, I know that individuals who distribute narcotics often utilize these mediums as methods by which to arrange narcotics transactions. Cell phones also retain information about the locations of the user of the phone at the times drug-related transactions occur.

28.     I also know that narcotics traffickers often store photographs or videos that may document drug trafficking activities or depict co-conspirators and that location information associated with these photographs or videos can provide information about the user of the phone and people in the photographs/videos. I also know that these phones may store evidence of monetary transactions related to drug trafficking or other illegal activity.

## TECHNICAL TERMS

29. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

  connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30. Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on each Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

35. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

                Respectfully submitted,

                /s/ Juan Infante
                Juan Infante
                Task Force Officer
                DEA

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Jun 15, 2021**
Time: 10:26 AM, Jun 15, 2021

                Hon. Andrea K. Johnstone
                United States Magistrate Judge

# ATTACHMENT A

The property to be searched is a black iPhone with a black Otterbox cover (no serial number visible) in an evidence bag labeled F19-15910 MRB-09, hereinafter "Device 1," and a cracked silver iPhone with a red case in an evidence bag labeled F19-15910 MRB-10, hereinafter "Device 2," collectively, "the Devices." The Devices are currently located in the New Hampshire State Police Troop F evidence room, at 549 US Route 302, Twin Mountain, New Hampshire.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1. All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and 846 specifically including:

    a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used to cut, package, or use controlled substances;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

    d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

    e. information related to communication with coconspirators and sources of supply or identification of coconspirators including chats, calls, other communications, photos and videos;

    f. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

    g. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances including photos and videos on the phone itself and in applications like WhatsApp, Instagram, or others, stored on the phone;

      h.  all bank records, checks, credit card bills, account information, and other financial records.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.